IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION

| | |
|---|---|
| KIM AMOS; and JACK AMOS,<br><br>    Plaintiffs,<br><br>v.<br><br>JAMES C. HODGE; and LISA C. HODGE,<br><br>    Defendants. | CIVIL ACTION NO.: 5:22-cv-10 |

**O R D E R**

This matter is before the Court on Defendants' Motion to Exclude Expert Testimony of Timothy Hebert.  Doc. 27.  Plaintiffs responded in opposition.  Doc. 34.  For the following reasons, the Court **DENIES** Defendants' Motion.

BACKGROUND

This case concerns a sale of property that occurred on July 26, 2021.  Doc. 1.  After purchasing the home but prior to moving in, Plaintiffs discovered the home had several defects resulting from water intrusion.  Id. at 4.  Plaintiffs allege Defendants defrauded Plaintiffs and breached the home sale contract by failing to inform Plaintiffs of water intrusion at the home.  Id. at 4–8.

Plaintiffs identified one expert—Timothy Hebert—to testify about the need for repairs and the duration of the water intrusion.  Doc. 34 at 3.  Plaintiffs assert this testimony is relevant to their allegations Defendants concealed water damage and made false disclosure statements regarding water intrusion.  Id. at 2.

Defendants challenge Mr. Hebert's ability to offer his opinions under O.C.G.A. § 24-7-702, which is the same in substance to the standard applied in Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993), and Rule 702.[1]  Doc. 27; see also O.C.G.A. § 24-7-702 (f) (explaining courts may draw from "the opinions of the United States Supreme Court in Daubert, 509 U.S. 579; General Electric Co. v. Joiner, 522 U.S. 136 (1997); Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999); and other cases in federal courts applying the standards announced by the United States Supreme Court in these cases" when interpreting this Code section).  Given that this is procedural matter, state law does not apply for the Daubert determination, and the Court will examine the matter under the Rule 702 and Daubert.  See McDowell v. Brown, 329 F.3d 1283, 1294–95 (11th Cir. 2004) ("Admissibility of expert testimony is a matter of federal, rather than state procedure.") (citing United States v. Roark, 753 F.2d 991, 994 (11th Cir. 1985), and Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 292 (5th Cir. 1975)).

**LEGAL STANDARD**

The United States Supreme Court's holding in Daubert and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony.  Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In this Circuit, courts routinely look to three elements to determine if an expert is qualified under

---

[1] In their brief, Defendants cite O.C.G.A. § 24-9-67.1.  Doc. 27 at 4.  In 2011, the Georgia General Assembly reworked Title 24 to mirror the Federal Rules of Evidence more closely.  See EVIDENCE-- REVISION OF PROVISIONS, 2011 Georgia Laws Act 52 (H.B. 24).  O.C.G.A. § 24-9-67.1 was the previous citation—the current citation is O.C.G.A. § 24-7-702.

Daubert and Rule 702. As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted). "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). The trial court has broad latitude in evaluating each of these three factors.

As to qualifications, an expert may be qualified "by knowledge, skill, training, or education." Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1193 (11th Cir. 2010). The expert need not have experience precisely mirroring the case at bar in order to be qualified. Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001). However, where an expert does have experience directly applicable to an issue at bar, experience alone may provide a sufficient foundation for expert testimony. Frazier, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593–94. However, these factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech., 326 F.3d at 1341. At all times in

3

this flexible inquiry, the court's focus must be "solely on principles and methodology, not on the conclusions that they generate." Seamon v. Remington Arms Co., LLC, 813 F.3d 983, 988 (11th Cir. 2016) (citation omitted).

Finally, as to the third Daubert factor, expert testimony is likely to assist the trier of fact to the extent "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case." Kennedy v. Elec. Ins. Co., Case No. 4:18cv148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing Daubert, 509 U.S. at 591); Frazier, 387 F.3d at 1262–63. Rule 702 permits experts to make conclusions based on competing versions of the facts, but those conclusions must still assist the trier of fact by explaining something that is "beyond the understanding of the average lay person.'" Jackson v. Catanzariti, No. 6:12-CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing Frazier, 387 F.3d at 1262). Expert testimony generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. (quoting Cook v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1111 (11th Cir. 2005)). Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys., 50 F.3d 908, 917 (11th Cir. 1995) (citations omitted).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002). However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence."

4

Quiet Tech., 326 F.3d at 1341. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

## DISCUSSION

In his report, Mr. Hebert opines the house has been subjected to long term-water intrusion on all four elevations, as indicated by the presence and advanced stage of wood-destroying fungi. Doc. 27 at 43. Mr. Hebert also states widespread mold growth was visible on most of the exposed materials on both the exterior and interior surfaces of the first floor of the building envelope. He opines the advanced degree of degradation and decay suggests the intrusion issues have been occurring for years. Finally, he opines the residential structure should not be occupied until remedial efforts eliminate the documented contaminants. Id.

Defendants challenge Mr. Hebert's ability to offer any testimony, arguing he is not qualified to provide his expert opinions and his methodology is unreliable.[2] Doc. 27 at 7–9. Defendants do not challenge the helpfulness of Mr. Hebert's opinion. Plaintiffs argue Mr. Hebert is qualified to give his expert opinion and his methodology is reliable. Doc. 34.

**I.   Mr. Hebert Is Qualified to Give His Expert Opinion**

Defendants argue Mr. Hebert is not qualified to testify as an expert because he could not identify the presence of mold without having to ship samples off for testing.[3] Doc. 27 at 7–8.

---

[2]   Defendants also argue Mr. Hebert should not be able to offer diminution of value testimony because Plaintiffs are not entitled to damages in the form of diminution of value. Doc. 27 at 6. Plaintiffs, in response, assert they do not intend to rely on Mr. Hebert to testify about diminution in value in this case. Doc. 34 at 3. Indeed, nothing in Mr. Hebert's report or his deposition suggests he has offered testimony about diminution of value. See Doc. 27 at 12–40, 43–44. Therefore, I **DENY** this portion of Defendants' Motion.

[3]   The other arguments Defendants offer in this Section do not actually bear on Mr. Hebert's qualifications but are more applicable to the reliability of Mr. Hebert's methodology. See Doc. 27 at 7 (challenging Mr. Hebert's qualifications because Mr. Hebert only inspected the home after the sheetrock

5

Plaintiffs respond, stating any human requires a microscope to positively identify a species of mold.  Doc. 34 at 7.  Additionally, Plaintiffs argue Mr. Hebert is qualified because he has over 30 years of experience in mold assessment and is a licensed Florida mold assessor and mold remediator.[4]  Id. at 8.

      Mr. Hebert is qualified to give his expert opinion on the extent of the mold damage and that long-term water intrusion is the likely cause.  The "qualified" prong of the Daubert inquiry focuses on whether the expert is qualified "by knowledge, skill, training, or education."  Hendrix, 609 F.3d at 1193.  Mr. Hebert has over 32 years of experience in indoor air quality, building diagnostics, and HVAC systems hygiene.  Doc. 34-1 at 1.  He is both a certified microbial consultant and a certified microbial remediation supervisor with the American Council for Accredited Certification.  Id. at 1.  Mr. Hebert has worked for Air Purification Specialists, Inc., since 1989 in various capacities.  Id. at 1–2.  From the start, Mr. Hebert worked, and still works, as an investigator in the Building Envelope Investigation and Diagnostics Division of Air Purification Specialists.  Id. at 1.  In that capacity, Mr. Hebert is responsible for developing and implementing testing strategies to evaluate "failed building systems and the subsequent microbial loading within water-damaged structures."  Id.  He is also proficient in the bioaerosol and sampling protocols.  Id.  Mr. Hebert also works as an indoor remediation project consultant and has done so since 1992.  Id. at 2.  In this capacity, Mr. Hebert managed numerous water-damage and microbial contamination abatement projects.  Id.  He testified, as part of his work for Air Purification Specialists, Inc., 90% of his work involves dealing with mold.  Doc. 27 at 19.

---

was removed and because he was only retained to do his inspection five months following the sale of property).  The Court addresses these arguments in § II.

[4]     The State of Georgia does not have an equivalent license for mold assessment and remediation.

Defendants attempt to argue Mr. Hebert is not qualified to offer his opinion because he had to ship samples off for testing to verify the presence of mold. Id. at 7–8. Defendants assert if a mold expert must ship off samples to verify the presence of mold, then Defendants, as laypeople, certainly could not have identified the presence of mold. Id. This argument is unpersuasive. To the extent Defendants are attacking the persuasiveness of Mr. Hebert's testimony, this is a matter for the jury to decide. To the extent Defendants are attacking Mr. Hebert's qualifications due to his inability to personally verify a species of mold, this argument is equally unavailing. The fact Mr. Hebert could not immediately and with absolute certainty identify a breed of mold does not undermine his many years of training and experience in mold remediation. Indeed, as Mr. Hebert testified in his deposition, identifying "suspect visual mold growth" and then confirming mold growth by lab analysis is the general process in his line of work. Id. at 32. It is not a requirement for his line of work to be able to identify the type of mold growing by sight or without the benefit of laboratory testing. Mr. Hebert's utilization of laboratory testing does mean he is unqualified to offer expert opinions.

Based on Mr. Hebert's experience and training, he is qualified to testify on the results of his mold analysis, the extent of the mold damage, and how long the water intrusion likely lasted given the advanced stage of mold growth.

**II.     Mr. Hebert's Methodology Is Reliable**

Defendants argue Mr. Hebert's methodology is unreliable. Id. at 8–9. Defendants argue Plaintiffs do not establish any of the four factors courts commonly consider when they examine if the expert reached his conclusions via reliable methods. Id.; see Daubert, 509 U.S. at 593–94 (identifying four, non-exhaustive factors courts can use to determine a methodology is reliable).

Defendants also assert Mr. Hebert cannot provide any testimony other than reading what is contained on the reports from the lab to which he submitted samples. Doc. 27 at 9.

Plaintiffs respond Mr. Hebert's report shows his findings are based on trustworthy methodologies and the testimony has a reliable basis. Doc. 34 at 9. Plaintiffs point to Mr. Hebert's report that details the various tests Mr. Hebert performed in the home to inform his opinion. Id. Additionally, Plaintiffs argue Mr. Hebert did other tests in addition to the ones that required confirmation by an outside laboratory. Id.

First, it is important to identify the methods Mr. Hebert utilized to come to his ultimate opinion. Mr. Hebert states he personally took samples from the home so the laboratory could conduct six different tests to assess the environmental condition of the home: (1) non-viable bioaerosol air testing of 19 different sites; (2) destructive sampling; (3) microslide surface sampling of 13 suspect surfaces; (4) bulk sampling of degraded building materials at 11 sites for culture analysis; (5) DNA sequencing of suspect basidiomycetes located in the building envelope; and (6) an HVAC system hygiene survey with surface sampling for direct microscopic analysis. Doc. 27 at 43. After receiving the results, Mr. Hebert then, based on comparisons to expected baselines and other observations at the house and informed by his knowledge and experience, came to his ultimate conclusions. Id. at 23 (explaining the fieldwork was performed, then the lab analysis, and then he began developing the report), id. at 44 (explaining, in the conclusions, how his opinion came from his observations and test results). Mr. Hebert also performed an additional test that did not require a laboratory's verification, a perimeter moisture content survey of all interior perimeter walls. Id. at 44. In performing this survey, Mr. Hebert utilized a moisture meter to measure the moisture levels of the drywall on site. Id.

Mr. Hebert's underlying methodologies are sufficiently reliable under Daubert. In inspecting the home, Mr. Hebert took a variety of samples from multiple portions of the house, strictly following the American Industrial Hygiene Association ("AIHA") field sampling guide. Id. at 22; see also id. at 35 (detailing the methods to keep sampling materials sanitized). Mr. Hebert also performed a perimeter moisture content survey during his inspection, which revealed "wet-to-very-wet" conditions throughout the sampled walls. Id. at 44. Mr. Hebert then sent off the samples from his inspection to a laboratory to verify the presence of mold and the breed of mold, complying with the laboratory's shipping and receiving protocols. Id. Six types of sampling in total were performed, providing ample data from which Mr. Hebert could draw his conclusions. Once the results came back from the lab, Mr. Hebert reviewed the various data sets and formulated his opinion from comparisons with established baselines.

Mr. Hebert sufficiently explains how the data from the laboratory results and his on-site testing support his various opinions. For example, as to the non-viable bioaerosol sampling, Mr. Hebert explains all indoor air sample results are judged against the outdoor ambient air conditions. Id. at 43. He explains in a properly maintained building, indoor concentration and particle sizes are a reduced reflection of the outdoor conditions and deviations from these indicate presence of sources in the building. Id. Thus, when Mr. Hebert examined the data and found there were elevated levels of certain mold spores, he determined those levels are an indication of moisture damage within the building envelope. Id. Mr. Hebert did the same for each of the other five laboratory tests performed and, from those results and the results of his perimeter moisture survey, determined how long the water damage had been occurring.

Defendants assert Mr. Hebert's testimony is not reliable because it does not meet the four factors identified in Daubert used to examine the method with which the expert reaches his

conclusions. Doc. 27 at 8–9. This argument is unconvincing. In addressing the reliability of expert methodology, "district courts have substantial discretion in deciding how to test an expert's reliability." Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) (quoting United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999)). Those four factors are suggestions, not the definitive beginning and end of the inquiry. See Kumho Tire Co., 526 U.S. at 150 ("Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test."). As explained above, Mr. Hebert took his samples through proper procedures. He then received the results from laboratory tests of those samples, which he then linked to his opinion about the durations of the water damage. Plaintiffs' failure or inability to establish the four factors discussed in Daubert does not mean Mr. Hebert's methods are unreliable.

Defendants offer other reasons the Court should determine Mr. Hebert's methods are unreliable. They argue the mold inspection took place approximately five months following the sale of the property and after interior walls had been removed; thus, Mr. Hebert's testimony is not reliable in determining what Defendants should have noticed prior to the house sale. Doc. 27 at 7. The information experts rely on and a failure to consider variables generally go to weight, not admissibility. Vincent v. Am. Honda Motor Co., No. CV 108-067, 2010 WL 11537726 (S.D. Ga. July 1, 2010) (citing Bazemore v. Friday, 478 U.S. 385, 400 (1986)). "[T]he identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination." McGarity v. FM Carriers Inc., No. CV410-130, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) (citing Daubert, 509 U.S. at 596; Quiet Tech., 326 F.3d at 1345–46). Defendants' arguments about the time of the mold inspection and whether the interior walls were in place at the time of the inspection are arguments about the weight of the evidence and, therefore, are matters to be explored by vigorous cross-examination.

Finally, Defendants assert Mr. Hebert's testimony is not actually expert testimony because he is simply reading what is contained on the laboratory reports. This assertion is inaccurate. While Mr. Hebert utilized laboratory testing of the samples he took, his interpretation of the laboratory results and his use of the results to form an opinion about the duration of the water intrusion are based on his expertise and years of training—this constitutes an expert opinion. For example, the laboratory results do not—without more—explain the duration of the water intrusion. Instead, Mr. Hebert relies on those results to form an expert opinion about duration. Additionally, while Mr. Hebert sent some samples off for laboratory analysis, he also performed a perimeter moisture content survey, a test that did not require the independent confirmation of a laboratory. This also informs his expert opinion about duration of water intrusion.

For the above reasons, Plaintiffs have established Mr. Hebert is suitably qualified to give expert testimony and his testimony is reliable under <u>Daubert</u>.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion. Mr. Hebert will be permitted to offer testimony on: (1) whether the subject property suffered from long-term water intrusion; (2) the duration of that water intrusion; and (3) whether the subject property can be occupied during remediation efforts.

**SO ORDERED**, this 15th day of June, 2023.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA